DARREN E. LONG (*pro hac vice pending*)
Email:  longd@sec.gov
Telephone: (202) 551-4788
BRIAN D. VANN (*pro hac vice pending*)
Email:  vannb@sec.gov
Telephone: (202) 551-7165
Securities and Exchange Commission
100 F Street N.E.
Washington, DC 20549-5985

LOCAL COUNSEL:
GARY Y. LEUNG (Cal. Bar No. 302928)
Email: leungg@sec.gov
Securities and Exchange Commission
444 S. Flower Street, Suite 900
Los Angeles, CA 90071
Telephone:  (323) 965-3988
Facsimile:  (213) 443-1904

Attorneys for Plaintiff
Securities and Exchange Commission

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>    vs.<br><br>FAIZ M. CHOWDHURY, DTI HOLDINGS, INC. and QUANTUM AGE CORPORATION,<br><br>        Defendants. | Case No.<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission alleges:

## I.      JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to the Securities Act of 1933 ("Securities Act") Sections 20(b), 20(d) and 22(a) [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)] and the Securities Exchange Act of 1934 ("Exchange Act") Sections 21(d) and 27(a) [15 U.S.C. §§ 78u(d) and 78aa(a)].

2.      In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly, or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, the mails, and/or the facilities of a national securities exchange.

3.      Venue is proper in this district pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a) and Exchange Act Section 27 [15 U.S.C. § 78aa] because certain of the acts and transactions constituting the violations alleged in this Complaint occurred in this district, and because all Defendants reside or resided in this district.

## II.     DEFENDANTS

4.      **Faiz M. Chowdhury ("Chowdhury")**, age 54, resides in Irvine, California and is a dual citizen of Bangladesh and the United States.  He is the founder and majority shareholder of both DTI and QAC, and at all times relevant to the complaint was the chairman, president, and chief executive officer of each company.

5.      **DTI Holdings, Inc. ("DTI")** is a defunct Delaware corporation that previously had its principal office in Irvine, California.

6.      **Quantum Age Corp. ("QAC")** is a Delaware corporation with its principal office in Irvine, California.

## III.    INTRODUCTION

7.      The Commission brings this action to enjoin Chowdhury and his companies DTI and QAC (collectively, "Defendants") from violating the antifraud

provisions of the federal securities laws.  Beginning in at least 2018, Defendants engaged in a scheme to raise money from investors through a series of material misrepresentations and other deceptive acts, raising over $25 million from more than 50 debt and equity investors in the United States and around the world.  Investors were told they were investing in a global enterprise of groundbreaking, IP-rich start-up companies, and were misled about the assets, technologies, and finances of DTI and QAC, as well as Chowdhury's own experience and credentials.

8.     In his marketing pitches to potential investors, Chowdhury falsely presented himself as a Doctor of Science, a physicist, and an intellectual prodigy. He fabricated an elite academic pedigree, including degrees from Harvard University, the Massachusetts Institute of Technology ("MIT"), and Johns Hopkins University.

9.     Chowdhury promised investors that their money would be used by his companies, DTI and QAC, to "Pioneer the Next Age of Humanity" through innovative graphene-based technologies.  He falsely told investors that he was the original inventor of graphene but could not be publicly credited because the work had been top secret.

10.     Chowdhury assured investors that he would use their money to fund a vast array of affiliated and subsidiary start-up companies working on game-changing, graphene-based nanotechnologies, including fast-charge batteries, cancer detection and treatment solutions, anti-counterfeiting devices, and snake-venom antidotes.  Promising that his graphene-based technologies were "commercial-ready solutions" that would soon be available on the market, Chowdhury presented investors with misleading financial proformas projecting astronomical revenues into the tens and even hundreds of millions of dollars.

11.     In reality, only a small amount of investor money was used for business purposes.  In addition to his own salary, Chowdhury used the DTI and QAC bank accounts as a personal piggy bank, making excessive cash withdrawals, funding

extravagant trips around the world, transferring funds to various entities he controlled, purchasing luxury items for himself and his family, and using investor funds to indulge in gambling and leisure.

12.   As a result of the conduct alleged in this Complaint, Defendants violated Securities Act Section 17(a) [15 U.S.C. §§ 77(q)(a)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5]. Chowdhury also aided and abetted DTI's and QAC's violations of the foregoing anti-fraud provisions pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)], and alternatively is liable as a control person of both DTI and QAC pursuant to Exchange Act Section 20(a) [15 U.S.C. § 78t(a)].

13.   Unless restrained and enjoined, Defendants are reasonably likely to continue to violate the federal securities laws.

## IV.   FACTS

### A.   History of DTI and QAC

14.   Chowdhury has controlled, operated, and held executive positions with DTI and QAC since their inceptions. Beginning no later than May 2018, Defendants have offered and sold securities in the form of subscription agreements and convertible promissory notes, first in DTI and later in QAC, raising over $25 million from more than 50 debt and equity investors.

15.   Chowdhury incorporated DTI on June 23, 2016, and has always served as the company's CEO, chairman, and majority shareholder. He rented a large commercial space for its headquarters in Irvine, California, and by no later than May 2018, was raising money from U.S. and overseas investors, primarily in Asia.

16.   Chowdhury touted DTI as a holding company of cutting-edge technology companies purportedly using a material called graphene to forge new advances in health, energy, and transportation. Promising to "Pioneer the Next Age of Humanity," Chowdhury presented himself as a degreed academic, a visionary, and an accomplished businessman who had started and successfully exited numerous

technology companies.

17.     In marketing materials, Chowdhury described DTI as a company that was already "inventing, innovating, and commercializing disruptive technologies" through wholly-owned subsidiaries, many of which were headed by several prominent scientists, inventors, and academics.  Chowdhury told investors that these companies were ready to commercialize revolutionary discoveries in areas like cancer detection, fast-charging batteries, and antibody research.

18.     As discussed below, Chowdhury's representations to investors about his academic credentials and experience, as well as DTI's and its subsidiaries' ownership of intellectual property and ability to commercialize purported technology, were false and misleading.  And while Chowdhury spent some investor money furthering the aims of DTI by making small payments to contractors and other companies with which Chowdhury had some connection, he largely misappropriated investor funds, contrary to his promises and representations to investors.

19.     By late 2019, some investors in DTI began complaining that Chowdhury had misled them, mismanaged their investments, and failed to make any progress toward commercializing the purported technologies.  Chowdhury created QAC on September 23, 2019, to rebrand the DTI venture and separate the growing number of disgruntled DTI investors from his continuing solicitations for investor money.

20.     Since its inception, Chowdhury has served as QAC's CEO, chairman, and majority shareholder.  Chowdhury used the same marketing model for touting QAC that he used for DTI, claiming he operated a holding company of graphene-centered tech companies on the verge of bringing groundbreaking products to market.  Chowdhury claimed that QAC would "dynamically address the unmet needs that are foundational to our existence," and that it invented and developed "products and solutions that are critical to sustain life."

21.    When some DTI investors began demanding their money back, Chowdhury used some of the new investor funds raised by QAC to make Ponzi-like payments to prior investors.  DTI is currently defunct, though Chowdhury continues to operate QAC.

**B.    Chowdhury's Material Misrepresentations to Investors**

22.    During in-person meetings, calls, communications, and on-screen presentations to investors, Defendants made materially false and misleading statements about Chowdhury, DTI, and QAC.  Defendants knew or were reckless in not knowing that these statements were false and misleading.  Chowdhury had the ultimate authority over all statements made to investors.

**1.    Material Misrepresentations Regarding the Use of Investor Funds**

23.    Defendants promised investors that the funds raised from their purchase of securities would be used to develop and commercialize the technologies of the purported subsidiaries, or for other operating expenses such as rent, payroll, and insurance.  These statements, however, were materially false and misleading.  As described in more detail in Section C below, less than $7 million of the more than $25 million raised by the Defendants was used for those purposes.

24.    In addition to general misrepresentations regarding DTI's and QAC's use of investor funds, Chowdhury made specific misstatements about the companies' uses of funds during personal appeals to individual investors.  For instance, Chowdhury approached an existing DTI investor in November 2019 and asked for an additional $100,000 investment so he could pay employee salaries for the holidays and back-rent that DTI owed.  The investor provided the funds, but Chowdhury did not pay employee salaries or the rent as promised.

25.    Chowdhury told another potential investor during a sales pitch for DTI that 300 Cells, Inc. ("300 Cells") – a purported DTI subsidiary working on cancer detection technologies – had discovered a cure for cancer.  That individual invested

$150,000 based on Chowdhury's promise that the funds would be used to further the mission of 300 Cells.  In fact, neither DTI nor 300 Cells had discovered or even attempted to develop a cure for cancer, and the investor's funds were not used for or transferred to 300 Cells.

### 2.   Material Misrepresentations Regarding DTI and QAC Assets & Technology

26.   Starting no later than 2018, Defendants made material misrepresentations to investors about the assets purportedly held by DTI and QAC. They falsely told investors that DTI and QAC were holding companies with subsidiaries that owned intellectual property rights over numerous technologies and the associated right to any revenue and profits from those technologies.  These claims were false.  Nearly all of the purported subsidiary companies touted to investors were either companies not owned or affiliated with DTI or QAC, or were shell companies with little or no revenue, assets, or operations.

27.   Chowdhury frequently claimed to investors that DTI owned various subsidiaries that operated in multi-billion-dollar markets.  Some of the purported subsidiaries included 300 Cells, Quantum Core Corporation ("QCC"), and Vittoria Tire, Ltd. ("Vittoria").

28.   In one investor presentation, Chowdhury claimed that Vittoria was one of DTI's "current subsidiaries" providing $70M of revenue.  Vittoria was an Italian tire manufacturer that had been in business for nearly 70 years, but it was never owned or affiliated with DTI or Chowdhury.  Chowdhury approached Vittoria in 2017 concerning a possible acquisition or affiliation, but nothing resulted from that inquiry.  Chowdhury falsely claimed the company was a DTI subsidiary for years afterward.

29.   Chowdhury also misrepresented the intellectual property and other assets DTI and QAC purportedly owned through its subsidiaries. Chowdhury falsely claimed in documents provided and shown to investors that DTI and QAC

subsidiaries owned or had exclusive use of patents and other forms of intellectual property, including the right to distribute numerous revolutionary technologies.

30.     In one presentation, Chowdhury claimed that QAC owned or had exclusive use of seven or more patents and other forms of intellectual property.  This claim was false.  Neither DTI nor QAC owned any patents.  While DTI did lease from a few third parties the option to use their intellectual property for limited uses, Defendants did not make the scheduled payments as agreed, did not use the intellectual property toward commercializing any products, and the options expired.

31.     Chowdhury also misled investors about when DTI's and QAC's technologies would be commercially viable.

32.     In one marketing document, Chowdhury told investors that purported subsidiaries Quantum Dots and 300 Cells were "commercially ready solutions," and that DTI's fast-charging battery "will start generating revenue in Q4 2018."  In another DTI marketing document, Chowdhury told investors that QCC was "ready for commercialization" and would be "in product" by 2018.  These statements were materially and knowingly misleading as Chowdhury had no reasonable factual basis for making them.  In fact, only one company in the DTI or QAC family – a small manufacturer of medical cooling vests that operated for years before Chowdhury's involvement – ever generated any revenue, and that revenue totaled less than $100,000.  That company ultimately ceased all operations after Chowdhury left it so cash-strapped that it was unable to pay its employees.

33.     On more than one occasion, Chowdhury falsely told investors during marketing pitches that DTI had created a cure for cancer.  In one instance, aware that the mother-in-law of one investor had recently died from cancer and that the issue was emotional for him, Chowdhury went so far as to hold up a vile filled with a black liquid and falsely told the audience it contained a "cure for cancer."

///

///

### 3.     Material Misrepresentations Regarding Chowdhury's Experience and Credentials

34.     Chowdhury repeatedly made material misrepresentations to investors about his experience, accomplishments, and academic credentials.

35.     Chowdhury falsely represented that as a child in Bangladesh, village leaders identified him as a savant and that the U.S. government later recruited him to work on a top-secret government program to develop graphene for military and commercial applications.  Chowdhury falsely told investors that he was the original inventor of graphene, but because of the secrecy of his government work, he could not be named on any patent or given credit in any public sphere.  He also falsely told investors that before he left the government he served as a scientific advisor to President George W. Bush and that he was later an advisor and friend of Senator John McCain.

36.     Chowdhury falsely represented to investors that he "pioneered scientific breakthroughs" at some of the nation's most prestigious scientific research centers, including the National Aeronautics and Space Administration, Oak Ridge National Laboratory, California Institute of Technology and the Johns Hopkins Applied Physics Lab.

37.     Chowdhury also touted completely fabricated academic credentials.  Presenting himself in person and in documents with the title "Doctor," he claimed at different times and in different settings the following academic credentials:

- Doctor of Science in Physics from MIT
- Doctor of Science in Nuclear and Particle Physics from MIT
- Doctor of Science in Quantum Physics from Johns Hopkins APL
- Senior Executive Fellow at Harvard Kennedy School of Government
- Senior Executive Fellow at MIT Sloan

These claims were material and false.

///

### 4. Material Misrepresentations Regarding Chowdhury's Own Investment in DTI

38.     Chowdhury falsely told several investors that he had invested anywhere between $1 million and $3 million of his own money in DTI.  He falsely told one investor that he had acquired the money he invested in DTI by selling to a major Korean electronics company a patent for a valuable technology he invented.

39.     In fact, Chowdhury did not invest any of his own money in DTI.  His only so-called personal investment in the company was a purported $1 million "loan" from one investor who had himself invested several million dollars in DTI. Chowdhury used the loan to pay his own salary and personal expenses.

### 5. Material Misrepresentations Regarding Projected Revenue of DTI and QAC

40.     DTI and QAC marketing documents shown to prospective investors contained revenue projections that were false and misleading because there was no reasonable factual basis for the projections.

41.     One DTI marketing document that Chowdhury used during investor pitches in 2018 provided an "Income Statement" for QCC, one of the purported subsidiaries of DTI.  It projected QCC would produce a majority of DTI's revenue between 2019 and 2021, including $18 million in 2019, $39.7 million in 2020, and $78.8 million in 2021.  QCC was not a subsidiary of DTI and had no employees or revenue, and Chowdhury had not reasonable basis for these projections.

42.     DTI sent a May 2018 marketing presentation for one of its purported subsidiaries, QCC, to an investor in advance of a June 2018 investment.   That document projected QCC revenue of $11.5 million for 2019, $143.5 million for 2020, $341 million for 2021, and $577 million for 2022.  Later that year, Chowdhury updated the projected revenue of QCC to $2 *billion* by 2025.

43.     On December 10, 2018, Chowdhury emailed an investor a DTI financial model "base case" and noted in his cover email that "we will have over $15

million cash in 2020 and $40 million cash in 2021" in what he described as "the worst-case scenario."  Chowdhury went on to claim that "we shall generate over $100 million EBITDA by 2023 which will give DTI a value over $1 Billion USD."

44.   Chowdhury had no reasonable basis for making these statements.

45.   A QAC marketing document utilized by Chowdhury during investor presentations in 2020 included 2021 revenue projections for the purported subsidiaries of QAC.  It projected $5.3 million of revenue for Quantum Cyber AI, $3.7 million for 3RDGP Corporation, and $5.5 million for a subsidiary called QZULU Corporation.  Chowdhury had no reasonable basis for these revenue projections.

46.   Chowdhury emailed another investor on July 1, 2020, attaching a prospectus for QZULU Corporation.  In the cover email, Chowdhury told the investor that the only challenge for the QZULU project was "timing," and assured him that they would receive "a good amount of fund [sic] in July," from five different investors.  The prospectus itself claimed that QZULU was offering $8 million of preferred stock in the form of QZULU tokens (which never launched), and projected year-one revenue of more than $15 million from QZULU's two biggest projects, QPOWER and QFARMS, and year-five revenue from the same entities of more than *$1.5 billion*.

47.   These materially misleading revenue forecasts were unsupported and internally inconsistent.  Despite the claims of massive future revenue, only one company owned by DTI or QAC ever produced actual revenue.  The revenue from that company was less than $100,000 before it became illiquid and ceased operations.

C.   **Chowdhury's Misappropriation of Investor Funds and Other Deceptive Acts**

48.   All told, Chowdhury raised approximately $26.4 million from DTI and QAC investors between May 2018 and December 2022.  Chowdhury promised

investors the funds would be used to develop and commercialize the technologies of the purported subsidiaries, or for other operating expenses, such as rent, payroll, and insurance.

49.    While he used some funds for such expenses, Chowdhury fraudulently misappropriated most of the DTI and QAC investor funds, transferring money to overseas bank accounts and entities with no apparent connection to DTI or QAC, or using them for his personal expenditures.  Chowdhury also used investor funds to make Ponzi-like payments, as money from new investors was used to pay current investors who had accused Chowdhury of misconduct, threatened legal action, and demanded their money be returned.

50.    For example, one investor in early November 2018 demanded Chowdhury return his $150,000 investment in DTI after he became suspicious of Chowdhury.  Within a week, Chowdhury received three new investments from other investors, totaling $150,000, which Chowdhury used to pay the prior investor.

51.    As another example, Chowdhury in texts throughout 2020 and 2021 repeatedly told an investor who was seeking repayment of promissory notes that DTI had no money to pay him until he could secure investments from new investors. Chowdhury's pitches to the new QAC investors did not disclose that funds would be used to pay off previous investors in DTI.

52.    To conceal his misappropriation of investor funds, Chowdhury maintained tight control of DTI's and QAC's finances and enlisted family members with little or no financial experience to help him.  For example, Chowdhury hired his cousin, who had no previous experience in accounting or finance, as DTI's purported "Corporate Controller."  He added his cousin's wife – who had no experience with finances – as a co-signer on QAC bank accounts, also listing her, falsely, as the company's "Controller."  He falsely listed his wife, who had no role with either DTI or QAC, as the companies' "Corporate Secretary" to sign and authorize bank account opening documents.

53.     Chowdhury also maintained at least 40 bank accounts at four different banks and created no less than 30 entities purportedly related to DTI and QAC. Neither DTI nor QAC kept consistent financial records, and neither undertook independent or internal audits. Chowdhury did not use a transfer agent and did not appear to adequately record and maintain the companies' stock issuances. At one point, Chowdhury hired a contractor to organize the companies' finances, but did not provide that person complete access to banking and financial records, and soon stopped paying his invoices.

54.     Records indicate that Chowdhury used the money he raised from DTI and QAC investors in the following ways:

- $2.1 million withdrawn from ATM machines or bank tellers in cash by Chowdhury and his family, including numerous withdrawals from ATM machines located at casinos in Lake Tahoe and Las Vegas

- $1 million used by Chowdhury and his family for personal expenses, including car payments, meals, wine, travel and jewelry

- $7.9 million wired to businesses that have no known or apparent connection to DTI or QAC

- $1.8 million used to pay back other investors in Ponzi-like payments, often after investors raised concerns about Chowdhury and his companies

- $7 million unaccounted for, largely due to Chowdhury's many domestic and overseas bank accounts, spread across four different financial institutions, and encompassing thousands of unexplained bank transactions

55.     Defendants used only about $6.6 million of the $26.4 million they raised from investors for operating expenditures relating to DTI and QAC, including rent, payroll, investments, equipment, and insurance.

///

**THE STATUTORY PERIOD HAS BEEN TOLLED**

56.     On February 1, 2023, Chowdhury entered into a tolling agreement with the SEC ("Tolling Agreement") on behalf of himself, DTI, and QAC (as CEO of both entities) tolling and suspending the statute of limitations from March 1, 2023 to September 1, 2023.

**FIRST CLAIM FOR RELIEF**

**Violations of Section 17(a) of the Securities Act**

**(All Defendants)**

57.     The Commission repeats and realleges Paragraphs 1 through 56 of its Complaint.

58.     From no later than May 2018 through at least 2022, Defendants, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails:  (a) with scienter, employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchaser of such securities.

59.     By reason of the foregoing, Defendants violated, and unless enjoined are reasonably likely to continue to violate, Securities Act Section 17(a) [15 U.S.C. § 77q(a)(1), (2) and (3)].

**SECOND CLAIM FOR RELIEF**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**

**(All Defendants)**

60.     The Commission repeats and realleges Paragraphs 1 through 56 of its Complaint.

61.     From no later than May 2018 through at least 2022, Defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security; by the use of means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, with scienter:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

62.     By reason of the foregoing, Defendants violated, and unless enjoined are reasonably likely to continue to violate, Exchange Act Section 10(b) and Rule 10b-5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a), (b) and (c)].

### THIRD CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 17(a) of the Securities Act**

**(Defendant Chowdhury)**

63.     The Commission repeats and realleges Paragraphs 1 through 56 of its Complaint.

64.     From no later than May 2018 through at least 2022, Defendants DTI and QAC, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails:  (a) with scienter, employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchaser of such securities.

65.     By reason of the conduct described above, Chowdhury, acting

knowingly or recklessly, provided substantial assistance to, and thereby aided and abetted, DTI's and QAC's violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)(1), (2) and (3)].

66.     Accordingly, Chowdhury, pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)], is liable for those violations.

## FOURTH CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**

**(Defendant Chowdhury)**

67.     The Commission repeats and realleges Paragraphs 1 through 56 of its Complaint.

68.     From no later than May 2018 through at least 2022, Defendants DTI and QAC, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security; by the use of means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, with scienter:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

69.     By reason of the conduct described above, Chowdhury, acting knowingly or recklessly, provided substantial assistance to, and thereby aided and abetted, DTI's and QAC's violations of Exchange Act Section 10(b) and Rule 10b-5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a), (b) and (c)].

70.     Accordingly, Chowdhury, pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)], is liable for these violations.

///

**FIFTH CLAIM FOR RELIEF**

**Control Person Liability**

**(Defendant Chowdhury)**

71.     The Commission repeats and realleges Paragraphs 1 through 56 of its Complaint.

72.     From no later than May 2018 through at least 2022, Defendants DTI and QAC, which were under Chowdhury's control, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security; by the use of means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, with scienter:   (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

73.     By reason of the conduct described above, Chowdhury was a control person of DTI and QAC in that Chowdhury exercised actual power and control over DTI and QAC and was a culpable participant in their violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a), (b) and (c)].

74.     Accordingly, Chowdhury, pursuant to Exchange Act Section 20(a) [15 U.S.C. § 78t(a)], is liable for these violations.

**PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that the Court:

**I.**

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

///

**II.**

Issue judgments, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Defendants from, directly or indirectly, violating Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

**III.**

Issue judgments, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Defendant Chowdhury from aiding or abetting any violation of Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

**IV.**

Issue judgments, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Defendants from directly or indirectly, including, but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any securities, provided, however, that such injunction shall not prevent Defendant Chowdhury from purchasing or selling securities listed on a national securities exchange for his own personal account.

**V.**

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon, pursuant to pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

**VI.**

Order Defendants to pay civil penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)(3)].

///

1

## VII.

Bar Defendant Chowdhury from serving as an officer or director of a public company pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(6)].

## VIII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## IX.

Grant such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

DATED:  September 19, 2023

*/s/ Gary Y. Leung*

Gary Y. Leung
Counsel for Plaintiff
Securities and Exchange Commission
444 S. Flower Street, Suite 900
Los Angeles, CA 90071
Telephone:  (323) 965-3988
Facsimile:  (213) 443-1904
Email:  leungg@sec.gov

Darren E. Long
Email:  longd@sec.gov
Telephone: (202) 551-4788
Brian D. Vann
Email:  vannb@sec.gov
Telephone: (202) 551-7165
Counsel for Plaintiff
Securities and Exchange Commission
100 F Street N.E.
Washington, DC 20549-5985